# TREASURY INSPECTOR GENERAL FOR TAX ADMINISTRATION

## *There Was One Administrative Action With Respect to Violations of Fair Tax Collection Practices in Calendar Year 2005*

### April 2006

### Reference Number: 2006-10-070

This report has cleared the Treasury Inspector General for Tax Administration (TIGTA) disclosure review process and information determined to be restricted from public release has been redacted from this document.

**Phone Number** | **202-927-7037**
**Email Address** | **Bonnie.Heald@tigta.treas.gov**
**Web Site** | **http://www.tigta.gov**

April 21, 2006

**MEMORANDUM FOR** CHIEF HUMAN CAPITAL OFFICER
CHIEF COUNSEL

**FROM:**   Michael R. Phillips /s/ Michael R. Phillips
Deputy Inspector General for Audit

**SUBJECT:**   Final Audit Report – There Was One
Administrative Action With Respect to Violations of Fair Tax
Collection Practices in Calendar Year 2005 (Audit # 200610018)

This report presents the results of our review of violations of Fair Tax Collection Practices. The overall objective of this review was to obtain information on any Internal Revenue Se

**06 1364**

**FILED**

***EXHIBIT A***

AUG – 1 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

administrative or civil actions resulting from Fair Tax Collection Practices [1] violations by IRS employees.  Section (§) 1102 (d)(1)(G) of the IRS Restructuring and Reform Act of 1998 [2] requires the Treasury Inspector General for Tax Administration to include in one of its Semiannual Reports to Congress information regarding any administrative or civil actions related to the violations of the fair debt collection provisions of 26 U.S.C. § 6304.

## Synopsis

Our review of 45 cases closed during the period January 1 through December 31, 2005, that were coded as Fair Debt Collection Practices Act (FDCPA) [3] violations, and an additional 169 employee misconduct cases that are similar in nature to FDCPA cases, identified 1 administrative action with respect to violations of Fair Tax Collection Practices.  However, there were no civil actions that resulted in the IRS paying monetary settlements to taxpayers because of a Fair Tax Collection Practices violation.

## Response

We made no specific recommendations as a result of the analyses performed during this audit. However, IRS management reviewed a draft of this report and agreed with the facts and findings presented.

Copies of this report are being sent to the IRS managers affected by the report.  Please contact me at (202) 622-6510 if you have questions or Dan Devlin, Assistant Inspector General for Audit (Headquarters Operations and Exempt Organizations Programs), at (202) 622-8500.

# *Table of Contents*

## Background

## Results of Review

There Was One Administrative Action With Respect to Violations of Fair Tax Collection Practices

No Fair Tax Collection Practices Civil Actions Resulted in Monetary Settlements to Taxpayers

**EXHIBIT A**

# Appendices

Appendix I – Detailed Objective, Scope, and Methodology

Appendix II – Major Contributors to This Report

Appendix III – Report Distribution List

Appendix IV – Fair Tax Collection Practices Provisions

# ***Background***

Section (§) 1102 (d)(1)(G) of the Internal Revenue Service (IRS) Restructuring and Reform Act of 1998 (RRA 98) [4] requires the Treasury Inspector General for Tax Administration (TIGTA) to include in one of its Semiannual Reports to Congress information regarding any administrative or civil actions related to violations of the fair debt collection provisions of 26 U.S.C. § 6304, Fair Tax Collection Practices. [5] The IRS has traditionally referred to the 26 U.S.C. § 6304 violations as "Fair Debt Collection Practices Act" (FDCPA) [6] violations. The TIGTA Semiannual Report to Congress must provide a summary of such actions and include any judgments or awards granted.

The law itself does not provide an explanation of what is meant by "administrative actions." We used the IRS' definition when determining the number of FDCPA violations to be reported under RRA 98 § 1102 (d)(1)(G). The IRS' definition of administrative actions include disciplinary actions that range from admonishment to removal. Lesser actions, such as oral or written counseling, are not considered administrative actions.

As originally enacted, the FDCPA included provisions that restricted various collection abuses and harassment in the private sector. These restrictions did not apply to Federal Government practices. However, Congress believed that it was appropriate to require the IRS to comply with applicable portions of the FDCPA and to be at least as considerate to taxpayers as private creditors are required to be with their customers (see Appendix IV for a detailed description of the FDCPA provisions). As such, RRA 98 § 3466(a) required the IRS to follow Fair Tax Collection Practices in line with the FDCPA.

Taxpayer complaints about IRS employees' conduct can be reported to several IRS functions for tracking on its management information systems. If a taxpayer files a civil action or if IRS management determines that the taxpayer's rights related to Fair Tax Collection Practices were

***EXHIBIT A***

potentially violated, the complaint could be referred and then tracked on one or both of the following IRS systems:

- Office of Workforce Relations' Automated Labor and Employee Relations Tracking System (ALERTS), which generally tracks employee behavior that may warrant IRS management administrative actions.

- Office of Chief Counsel's Counsel Automated System Environment (CASE), which is an inventory control system that tracks items such as taxpayer civil actions or bankruptcies.

The IRS began tracking FDCPA codes on the ALERTS in March 1999 and on the CASE in June 1999.

For the Calendar Year 2005 review, we analyzed closed cases from the ALERTS and the CASE to identify violations of Fair Tax Collection Practices. However, we could not ensure the cases recorded on the ALERTS and the CASE constitute all Fair Tax Collection Practices violations. Furthermore, the scope of our audit was not intended to determine the accuracy or consistency of disciplinary actions taken against employees for Fair Tax Collection Practices violations that were not reported to the Office of Workforce Relations.

This review was performed at the Chief Human Capital and Chief Counsel Offices in the IRS National Headquarters in Washington, D.C., during the period January to March 2006. The audit was conducted in accordance with *Government Auditing Standards*. Detailed information on our audit objective, scope, and methodology is presented in Appendix I. Major contributors to the report are listed in Appendix II.

## *Results of Review*

## *There Was One Administrative Action With Respect to Violations of Fair Tax Collection Practices*

There were 45 cases initially coded as FDCPA complaints closed on the ALERTS during the period January 1 through December 31, 2005. [7] However, only 14 of the 45 cases involved administrative actions being taken against employees. Of the 14 cases with administrative actions, none were a violation of the FDCPA; 12 cases were miscoded in the ALERTS, and the allegations related to the FDCPA were not substantiated for the other 2 cases. Most of the miscoded cases involved unprofessional conduct of employees.

Because of the high number of miscoded cases, we also reviewed 169 additional cases involving

*EXHIBIT A*

employee misconduct allegations that are similar in nature to violations of Fair Tax Collection Practices and identified 1 case that was an FDCPA violation. The case involved an IRS employee using profane language in the presence of a taxpayer or taxpayer's representative while in the course of performing official duties. The case should have been coded as a violation of Fair Tax Collection Practices instead of unprofessional conduct of an employee. The employee left the IRS in lieu of removal.

Oral or written counseling is not considered an administrative action under the IRS' definition. Since the IRS does not routinely track all informal oral counseling or minor actions against its employees, it is not possible to determine how often, and for what reasons, informal oral counseling or other minor disciplinary actions occurred.

## No Fair Tax Collection Practices Civil Actions Resulted in Monetary Settlements to Taxpayers

Section 7433 of the Internal Revenue Code provides that a taxpayer may bring a civil action for damages against the Federal Government if an officer or employee of the IRS recklessly or intentionally, or by reason of negligence, disregards any provision of the Internal Revenue Code, or related regulation, in connection with the collection of Federal tax.

There were no cases closed on the CASE for which the IRS paid damages to taxpayers resulting from a civil action filed due to a Fair Tax Collection Practices violation.

**Appendix I**

# Detailed Objective, Scope, and Methodology

The overall objective of this audit was to obtain information on any Internal Revenue Service (IRS) administrative or civil actions resulting from Fair Tax Collection Practices (FTCP) [8] violations by IRS employees. Specifically, we:

I.    Identified the number of FTCP violations resulting in administrative actions.

A.    Obtained a computer extract from the Automated Labor and Employee Relations Tracking System (ALERTS) [9] of any cases opened after July 22, 1998, coded as Fair Debt Collection Practices Act [10] violations (Issue Codes 141 to 147), and closed during the period January 1 through December 31, 2005. We analyzed the ALERTS extract and obtained additional case file information from the Labor

**EXHIBIT A**

Relations function, if needed, to determine the type of violation.

B.    Determined if any cases involving FTCP violations resulted in administrative actions.

C.    Obtained a computer extract from the ALERTS of any cases opened after July 22, 1998, with the following Issue Codes:

- 058 (Unprofessional Conduct - limited to only those closed with a disposition code of 009 or higher).

- 114 (Conviction Assault/Battery - all disposition codes).

- 119 (Threat of Audit/Personal - all disposition codes).

- 999 (Not Otherwise Coded - limited to only those closed with a disposition code of 009 or higher) and closed during the period January 1 through December 31, 2005.

Note:  We did not attempt to independently validate the accuracy of the complete ALERTS database for this review.  We limited our work to only assess the accuracy of the Issue Codes for those cases which met our criteria as listed in steps I.A through I.C.

II.    Identified the number of FTCP violations resulting in IRS civil actions (judgments or awards granted) by obtaining a computer extract from the Counsel Automated System Environment [11] database of any Subcategory 6304 (established to track FTCP violations) cases opened after July 22, 1998, and closed during the period January 1 through December 31, 2005.  The Office of Chief Counsel identified no cases.

**Appendix II**

# _Major Contributors to This Report_

Daniel R. Devlin, Assistant Inspector General for Audit (Headquarters Operations and Exempt Organizations Programs)
Carl L. Aley, Acting Director
Kevin P. Riley, Audit Manager
Tom J. Cypert, Lead Auditor
Frank I. Maletta, Auditor
William E. Thompson, Auditor

*EXHIBIT A*

There Was One Administrative Action With Nine Violations of Fair Tax Collection Practices in Calendar Year 2005    Page 7 of 42

Case 1:06-cv-01364-EGS   Document 1-2   Filed 08/01/2006

**Appendix III**

## *Report Distribution List*

Commissioner  C
Office of the Commissioner – Attn:  Chief of Chief  C
Deputy Commissioner for Operations Support  OS
Director, Workforce Relations  OS:HC:R
National Taxpayer Advocate  TA
Director, Office of Legislative Affairs  CL:LA
Director, Office of Program Evaluation and Risk Analysis  RAS:O
Office of Management Controls  OS:CFO:AR:M
Audit Liaisons:  Chief Counsel  CC
          Chief Human Capital Officer  OS:HC

**Appendix IV**

# *Fair Tax Collection Practices Provisions*

To ensure equitable treatment among debt collectors in the public and private sectors, the Internal Revenue Service (IRS) Restructuring and Reform Act of 1998 [12] requires the IRS to comply with certain provisions of the Fair Debt Collection Practices Act. [13] Specifically, the IRS may not communicate with taxpayers in connection with the collection of any unpaid tax:

- At unusual or inconvenient times.

- If the IRS knows that the taxpayer has obtained representation from a person authorized to practice before the IRS, and the IRS knows or can easily obtain the representative's name and address.

- At the taxpayer's place of employment, if the IRS knows or has reason to know that such communication is prohibited.

Further, the IRS may not harass, oppress, or abuse any person in connection with any tax collection activity or engage in any activity that would naturally lead to harassment, oppression, or abuse.  Such conduct specifically includes, but is not limited to:

- Use or threat of violence or harm.

**EXHIBIT A**

- Use of obscene or profane language.

- Causing a telephone to ring continuously with harassing intent.

- Placement of telephone calls without meaningful disclosure of the caller's identity.

---

[1]
26 U.S.C. § 6304 (2004).
[2]
Pub. L. No. 105-206, 112 Stat. 685 (codified as amended in scattered sections of 2 U.S.C., 5 U.S.C. app., 16 U.S.C., 19 U.S.C., 22 U.S.C., 23 U.S.C., 26 U.S.C., 31 U.S.C., 38 U.S.C., and 49 U.S.C.).
[3]
15 U.S.C. §§ 1601 note, 1692-1692o (2000). The IRS has traditionally referred to the Fair Tax Collection Practices violations under 26 U.S.C. § 6304 as "Fair Debt Collection Practices Act" violations.
[4]
Pub. L. No. 105-206, 112 Stat. 685 (codified as amended in scattered sections of 2 U.S.C., 5 U.S.C. app., 16 U.S.C., 19 U.S.C., 22 U.S.C., 23 U.S.C., 26 U.S.C., 31 U.S.C., 38 U.S.C., and 49 U.S.C.).
[5]
26 U.S.C. § 6304 (2004).
[6]
15 U.S.C. §§ 1601 note, 1692-1692o (2000).
[7]
This included cases opened after July 22, 1998, and closed during the period January 1 through December 31, 2005.
[8]
26 U.S.C. § 6304 (2004).
[9]
The Office of Workforce Relations' ALERTS generally tracks employee behavior that may warrant IRS management administrative actions.
[10]
15 U.S.C. §§ 1601 note, 1692-1692o (2000).
[11]
The Counsel Automated System Environment is an Office of Chief Counsel inventory control system that tracks items such as taxpayer civil actions or bankruptcies.
[12]
Pub. L. No. 105-206, 112 Stat. 685 (codified as amended in scattered sections of 2 U.S.C., 5 U.S.C. app., 16 U.S.C., 19 U.S.C., 22 U.S.C., 23 U.S.C., 26 U.S.C., 31 U.S.C., 38 U.S.C., and 49 U.S.C.).
[13]
15 U.S.C. §§ 1601 note, 1692-1692o (2000).

**EXHIBIT A**

Fiscal Year 2005 Statutory Audit of Compliance With Legal Guidelines Prohibiting the Use of Illegal Tax Protester and Similar Designations

# Fiscal Year 2005 Statutory Audit of Compliance With Legal Guidelines Prohibiting the Use of Illegal Tax Protester and Similar Designations

## July 2005

## Reference Number: 2005-40-104

This report has cleared the Treasury Inspector General for Tax Administration disclosure review process and information determined to be restricted from public release has been redacted from this document.

July 5, 2005

MEMORANDUM FOR DEPUTY COMMISSIONER FOR SERVICES AND ENFORCEMENT
DEPUTY COMMISSIONER FOR OPERATIONS SUPPORT

FROM:    *(for)* Pamela J. Gardiner /s/ Margaret E. Begg
Deputy Inspector General for Audit

SUBJECT:    Final Audit Report - Fiscal Year 2005 Statutory Audit of Compliance With Legal Guidelines Prohibiting the Use of Illegal Tax Protester and Similar Designations (Audit # 200440052)

This review presents the results of our review of the Internal Revenue Service's (IRS) use of the designation "Illegal Tax Protester" (ITP) and similar designations. The overall objective of this review was to determine whether the IRS complied with IRS Restructuring and Reform Act of 1998 (RRA 98) Section (§) 3707 and internal IRS guidelines that prohibit IRS officers and employees from referring to taxpayers as ITPs or any similar designations.

Prior to enactment of the RRA 98, taxpayers were referred to the ITP Program when their tax returns or correspondence contained specific indicators of noncompliance with the tax law, such as the use of arguments that had been repeatedly rejected by the courts. Once a taxpayer's account was coded as an ITP, certain tax enforcement actions were accelerated. The designation was also intended to alert IRS employees to be cautious so they would not be drawn into confrontations with taxpayers.

RRA 98 § 3707 prohibits the IRS from referring to taxpayers as ITPs or any similar designations. The Treasury Inspector General for Tax Administration (TIGTA) is required to annually evaluate IRS compliance with the prohibition on the use of ITP or any similar designations.

In summary, the IRS has not reintroduced past ITP codes on the Master File, and formerly coded ITP taxpayer accounts have not been assigned similar Master File designations. In addition, the IRS does not have any current publications with ITP references and has initiated actions to remove ITP references from the various forms of the Internal Revenue Manual (IRM).

In 309 isolated instances, IRS employees continued to make references to taxpayers as ITPs and other similar designations in case narratives. The IRS has taken steps in directing its employees to prevent ITP and similar designations from appearing in case narratives. However, in its response to our Fiscal Year (FY) 2003 report, the IRS disagreed with our determination that, to comply with this provision, IRS employees should not designate taxpayers as ITPs or similar designations in case narratives. As a result, we elevated this disagreement to the Assistant Secretary for Management and Chief Financial Officer of the Treasury but have not yet received a response.

## EXHIBIT B

Fiscal Year 2005 Statutory Audit of Compliance With Legal Guidelines Prohibiting the Use of Illegal Tax Protester and Similar Designations

**Management's Response:** Since the IRS Office of the Chief Counsel issued an opinion that references to taxpayers as ITPs or similar designations in case narratives are not a violation of RRA 98 § 3707, the IRS continues to disagree with our determination on this issue. As a result, the IRS does not concur with our outcome measure as claimed. In addition, the IRS stated that all ITP designations will be removed from the IRM by the end of FY 2005. We will confirm whether all ITP designations have been removed from the IRM during next year's mandatory review. Management's complete response to the draft report is included as Appendix VII.

**Office of Audit Comment:** We continue to believe it is reasonable to conclude that, based upon the language of RRA 98 § 3707, IRS officers and employees should not label taxpayers as ITPs or similar designations in any IRS records, which include paper and electronic case files. IRS officers and employees should not designate taxpayers as ITPs or similar designations because such a designation alone contains a negative connotation and appears to label the taxpayer.

RRA 98 § 3707 provides that officers and employees of the IRS shall not designate taxpayers as ITPs or any similar designations. While there is little interpretive information provided concerning this provision, the Senate Committee Report (S. Rep. No. 105-174) states that the Committee is concerned taxpayers might be stigmatized by designation as an ITP. Further, the Report's explanation of this provision states that existing designations in the Master File must be removed and any other designations, such as on paper records that have been archived, must be disregarded.

We have not reported that those taxpayers designated by IRS employees as ITPs or similar designations have been harmed by these designations. Only a thorough review of each taxpayer's case and the treatment accorded the taxpayer would determine if these taxpayers have been harmed. Because the TIGTA is required to annually evaluate the IRS' compliance with this provision of the law, we have elevated the disagreement about whether employees are labeling taxpayers as ITPs to the Department of the Treasury and encourage the IRS to raise the issue as well.

Copies of this report are also being sent to the IRS managers affected by the report results. Please contact me at (202) 622-6510 if you have questions or Michael R. Phillips, Assistant Inspector General for Audit (Wage and Investment Income Programs), at (202) 927-0597.

**Table of Contents**

Background

Illegal Tax Protester Codes Were Not Used on the Master File

Internal Revenue Service Publications Do Not Contain Illegal Tax Protester References

The Internal Revenue Service Has Initiated Steps to Remove Illegal Tax Protester References From the Internal Revenue Manual

Employees Used Illegal Tax Protester or Similar Designations in Isolated Instances in Case Narratives

Appendix I – Detailed Objective, Scope, and Methodology

Appendix II – Major Contributors to This Report

Appendix III – Report Distribution List

Appendix IV – Outcome Measures

Appendix V – Use of Illegal Tax Protester and Similar Designations in Case Narratives by Internal Revenue Service Employees During Fiscal Years 2003, 2004, and 2005

*EXHIBIT B*

Fiscal Year 2005 Statutory Audit of Compliance With Legal Guidelines Prohibiting the Use of Illegal Tax Protester and Similar Designations

Appendix VI – Examples of Illegal Tax Protester and Similar Designations Found in Case Narratives

Appendix VII – Management's Response to the Draft Report

## Background

Internal Revenue Service (IRS) Restructuring and Reform Act of 1998 (RRA 98) Section (§) 3707 prohibits the IRS from referring to taxpayers as Illegal Tax Protesters (ITP) or any similar designations. In addition, the RRA 98 requires the removal of all existing ITP codes from the IRS Master File and instructs IRS employees to disregard any such designation not located on the Individual Master File.

Prior to enactment of the RRA 98, taxpayers were referred to the ITP Program when their tax returns or correspondence contained specific indicators of noncompliance with the tax law, such as the use of arguments that had been repeatedly rejected by the courts. Once a taxpayer's account was coded as an ITP, certain tax enforcement actions were accelerated. The designation was also intended to alert IRS employees to be cautious so they would not be drawn into confrontations with taxpayers.

The Congress had concerns that some taxpayers were being permanently labeled and stigmatized by the ITP designation. Taxpayers who subsequently complied with the tax laws could continue to be labeled as ITPs, which could bias IRS employees and result in unfair treatment.

Internal Revenue Code § 7803(d)(1)(A)(v) (2000) requires the Treasury Inspector General for Tax Administration to annually evaluate IRS compliance with the prohibition against using ITP or any similar designations. This is our seventh review since Fiscal Year (FY) 1999. These reviews have identified areas for improvement to help the IRS comply with the ITP designation prohibition.

This review was performed in the Appeals function, Criminal Investigation function, National Taxpayer Advocate function, and Office of Chief Counsel in Washington, D. C.; the Small Business/Self-Employed (SB/SE) Division in New Carrollton, Maryland; and the Wage and Investment (W&I) Division in Atlanta, Georgia, during the period September 2004 through April 2005. The audit was conducted in accordance with *Government Auditing Standards*. Detailed information on our audit objective, scope, and methodology is presented in Appendix I. Major contributors to the report are listed in Appendix II.

### Illegal Tax Protester Codes Were Not Used on the Master File

In prior reviews, we reported the IRS had removed the ITP codes from the Master File as required by RRA 98 § 3707. The ITP designation has not been reintroduced on the Master File.

RRA 98 § 3707 also prohibits using any designation similar to ITP. A review of the approximately 57,000 taxpayer accounts formerly coded as ITPs on the Master File identified no reassignments of these taxpayer accounts to any other Master File designation similar to ITP.

### Internal Revenue Service Publications Do Not Contain Illegal Tax Protester References

To help promote compliance with RRA 98 § 3707, IRS management issued directives for employees to update various publications to eliminate references to ITP terminology and programs. A review of IRS publications identified no ITP references.

### The Internal Revenue Service Has Initiated Steps to Remove Illegal Tax Protester References From the Internal Revenue Manual

In each of the six prior reviews, we identified multiple subsections throughout the various forms of the Internal Revenue Manual (IRM) that contained ITP references. During our FY 2004 review, we reported that there were 24 unique ITP references throughout the various forms of the IRM. In response to our report, the IRS stated that it had initiated actions to remove all remaining ITP references from the IRM.

In our current review, we found 19 unique ITP references in various versions of the IRM. Office of Chief Counsel management had already updated and removed 18 of

*EXHIBIT B*

Fiscal Year 2005 Statutory Audit of Compliance With Legal Guidelines Prohibiting the Use of Illegal Tax Protester and Similar Designations

these references from their functional IRM maintained on the IRS Intranet. IRS management informed us that 18 of the 19 references we identified should be removed as other IRM versions are updated to incorporate functional IRM revisions. One additional ITP reference was identified in the SB/SE Division functional IRM. In January 2005, we notified SB/SE Division management of this remaining ITP reference for correction.

Removing all ITP references from the various forms of the IRM would prevent IRS employees from being inadvertently encouraged to improperly label taxpayers as ITPs. Based on the actions taken, we believe no further recommendations are warranted at this time.

### Employees Used Illegal Tax Protester or Similar Designations in Isolated Instances in Case Narratives

Our FY 2005 review of a sample of computer systems used by IRS employees to document case activity identified 309 isolated instances in which 272 employees designated taxpayers as "tax protesters," "ITPs," "constitutionally challenged," or other similar designations. These actions are prohibited by RRA 98 § 3707. However, employees are allowed to document any statements made by a taxpayer or his or her representatives, and quoting a taxpayer's self-designation as an ITP is not prohibited by RRA 98 § 3707. A chart detailing where inappropriate IRS employee comments were made can be found in Appendix V, and examples of the inappropriate comments can be found in Appendix VI.

The IRS has taken steps in directing its employees to prevent ITP and similar designations from appearing in case narratives. On October 11, 2002, the IRS issued a Servicewide Electronic Research Program (SERP) alert reminding employees of the prohibition regarding the use of ITP or any similar designations. Business and functional units independently continued to take additional steps to address this issue. These included sending out additional guidance in the form of SERP alerts, email alerts, and memoranda; updating training; conducting quality reviews for ITP use; and counseling employees that continued to designate taxpayers as ITPs or other similar designations.

However, in response to our FY 2003 report, the IRS disagreed with our determination that, to comply with this provision, IRS employees should not designate taxpayers as ITPs or similar designations in case narratives. As a result, we elevated this disagreement to the Assistant Secretary for Management and Chief Financial Officer of the Treasury but have not yet received a response.

We believe it is reasonable to conclude that, based upon the language of the statute, IRS officers and employees should not label taxpayers as ITPs or similar designations in any IRS records, which include paper and electronic case files. IRS officers and employees should not designate taxpayers as ITPs or similar designations because such a designation alone contains a negative connotation and appears to label the taxpayer.

In isolated instances, employees referred to taxpayers specifically using ITP or similar designations in case narratives input on the following IRS computer systems between October 2003 and September 2004:

- Appeals Centralized Database System (ACDS): A review of 93,961 open Appeals narrative comment records identified 1 case in which 1 employee used similar designations when referring to a taxpayer in his or her case narrative.

- Automated Collection System (ACS): A review of approximately 2.4 million open ACS records identified 49 cases in which 44 employees used ITP or similar designations when referring to specific taxpayers in their case narratives.

- Criminal Investigation Management Information System (CIMIS): A review of 19,020 open and closed cases identified 3 cases in which 3 employees used ITP or similar designations when referring to specific taxpayers in their case narratives.

- Integrated Collection System (ICS): A review of approximately 1.1 million open ICS records identified 214 cases in which 187 employees used ITP or similar designations when referring to specific taxpayers in their case narratives.

- Taxpayer Advocate Management Information System (TAMIS): A review of 34,537 open TAMIS records identified 2 cases in which 2 employees used ITP or similar designations when referring to specific taxpayers in their case narratives.

- Taxpayer Information File (TIF): A review of approximately 17.2 million open TIF records identified 40 history notations in which 35 employees used ITP or similar designations when referring to specific taxpayers in the Activity Code field of the TIF.

This is the first year we evaluated the Activity Code field on the TIF. In addition to the 40 account history notes input between October 2003 and September 2004, we

### EXHIBIT B

Fiscal Year 2005 Statutory Audit of Compliance With Legal Guidelines Prohibiting the Use of Illegal Tax Protester and Similar Designations

identified 315 additional instances in which account history notes contained ITP or similar designations input prior to and after FY 2004.

We notified W&I Division and SB/SE Division management of the instances in which employees had used the account history notes section on the TIF to label taxpayers as ITPs or similar designations. W&I Division management immediately issued an alert to remind employees not to designate taxpayers as ITPs or anything similar in the account history notes. W&I Division management is also working with SB/SE Division management to eliminate the existing ITP and similar designations from the TIF.

In addition, we identified 116 instances in various case narratives in which employees had made references or inferences about the taxpayers' actions (e.g., taxpayer sent letters containing "typical protester language" or the taxpayer responded with "protester jargon"). We agree with the IRS that merely making references to a taxpayer's actions does not constitute a designation prohibited by this statutory provision. However, we are concerned these references could become, or be considered, permanent labels that could subsequently stigmatize taxpayers in future contacts with the IRS.

Since the IRS has previously taken actions to address many of these issues and there is an outstanding question concerning the legal interpretation of RRA 98 § 3707, we believe no further recommendations are needed at this time.

Appendix

## Detailed Objective, Scope, and Methodology

The objective of this review was to determine whether the Internal Revenue Service (IRS) complied with IRS Restructuring and Reform Act of 1998 (RRA 98) Section (§) 3707 and internal IRS guidelines that prohibit IRS officers and employees from referring to taxpayers as Illegal Tax Protesters (ITP) or any similar designations. The Treasury Inspector General for Tax Administration (TIGTA) is required to annually evaluate the IRS' compliance with the prohibition against using ITP or any similar designations. To complete this objective, we:

I.    Determined if the ITP coding on the IRS Master File was removed by reviewing all Accelerated Issuance Codes (Transaction Code 148) as of November 2004 for Business Master File (BMF) records and Individual Master File (IMF) records. We analyzed 102,860 BMF records and 614,246 IMF records containing a Transaction Code 148 on the account. We generally relied on the TIGTA Office of Information Technology for validation of the data provided to us. However, we did a limited validation of the data by researching a judgmental sample of 25 Taxpayer Identification Numbers (TIN) and 25 Employer Identification Numbers on the Integrated Data Retrieval System (IDRS).

We also compared our historic computer extract of approximately 57,000 taxpayers designated as ITPs before the RRA 98 was enacted to our BMF and IMF records with an Accelerated Issuance Code (Transaction Code 148) to determine if any new common codes were being used to classify the taxpayers as ITPs.

II.    Determined if the IRS Internal Revenue Manual (IRM) contained ITP or any similar designations by performing key word searches of the Servicewide Policy, Directive, and Electronic Research system; the Servicewide Electronic Research Program (SERP); the IRS electronic publishing Intranet web site; the IRS public Internet web site; and paper IRMs in December 2004. In addition, we determined if the Chief Counsel Directives Manual located on the IRS Office of Chief Counsel web site contained ITP or any similar designations by performing key word searches in December 2004. We specifically searched for corrections to the exceptions identified in our Fiscal Year 2004 report and determined if there were any new references.

III.    Determined if IRS publications still contained ITP or any similar designations by performing key word searches of the SERP, the IRS public Internet web site, and the IRS electronic publishing Intranet web site in October 2004 and the IRS 2004 Federal Tax Products CD-ROM in December 2004.

IV.    Determined if employees were using ITP or any similar designations within taxpayer case narratives on the IRS Integrated Collection System (ICS) by securing a copy of the ICS database and analyzing 1,083,521 ICS records open as of September 2004 with history action dates between October 2003 and September 2004. We did not perform a detailed validation of the ICS data because this information was provided directly from the IRS through the TIGTA Data Center Warehouse (DCW). However, we did a limited validation of the data by matching a judgmental sample of 25 TINs to the IDRS to determine if the accounts were in current collection status.

*EXHIBIT B*

## FILED

Q6 1364

AUG - 1 2006

NANCY MAYER WHITTINGTON, CLERK

Fiscal Year 2005 Statutory Audit of Compliance With Legal Guidelines Prohibiting the Use of Illegal Tax Protester and Similar Designations

V.    Determined if employees were using ITP or any similar designations within taxpayer case narratives on the IRS Automated Collection System (ACS) by securing a copy of the ACS database and analyzing 2,398,739 ACS records open as of September 2004 with history action dates between October 2003 and September 2004.  We did not perform a detailed validation of the ACS data because this information was provided directly from the IRS through the TIGTA DCW.  However, we did a limited validation of the data by matching a judgmental sample of 25 TINs to the IDRS to determine if the accounts were in current collection status.

VI.    Determined if employees were using ITP or any similar designations within taxpayer case narratives on the IRS Taxpayer Advocate Management Information System (TAMIS) by securing a copy of the TAMIS database and analyzing 34,537 open TAMIS records with activity between October 2003 and September 2004.  The Taxpayer Advocate Service provided the data and validation information to us.  The TIGTA DCW staff validated the TAMIS data received.  In addition, we did a limited validation of the data accuracy and completeness by looking up a judgmental sample of 25 cases by accessing TAMIS online.

VII.    Determined if employees were using ITP or any similar designations within taxpayer case narratives on the IRS Appeals Centralized Database System (ACDS) by securing a copy of the ACDS database and analyzing 93,961 open Appeals narrative comment records identified as received in the Appeals function between October 2003 and September 2004.  The data were provided directly from the IRS through the TIGTA DCW.  However, we did a limited validation of data accuracy and completeness by looking up a judgmental sample of 31 case records by accessing the ACDS online.

VIII.    Determined if employees were using ITP or any similar designations within taxpayer case narratives on the IRS Criminal Investigation Management Information System (CIMIS) by securing a copy of the CIMIS database and analyzing 19,020 cases opened on the CIMIS between October 2003 and September 2004.  The data were provided directly from the IRS and validated by the TIGTA Chicago Audit group.

IX.    Determined if employees were using ITP or any similar designations on the Taxpayer Information File (TIF) by analyzing 12,341,522 IMF and 4,901,558 BMF taxpayer accounts open on the IDRS as of January 2005 with Activity Code dates input between October 2003 and September 2004.  Since this was the first year we looked at the Activity Code field on the TIF, we also looked at taxpayer accounts that contained ITP or similar designations input before October 2003 and after September 2004.

**Appendix II**

## Major Contributors to This Report

Michael R. Phillips, Assistant Inspector General for Audit (Wage and Investment Income Programs)
Mary V. Baker, Director
Bryce Kisler, Audit Manager
Alan Lund, Lead Auditor
Tanya Boone, Senior Auditor
Julia Tai, Senior Auditor
Craig Pelletier, Auditor

**Appendix III**

## Report Distribution List

Commissioner  C
Office of the Commissioner – Attn:  Chief of Staff  C
Commissioner, Small Business/Self-Employed Division  SE:S
Commissioner, Wage and Investment Division  SE:W

*EXHIBIT B*

Fiscal Year 2005 Statutory Audit of Compliance With Legal Guidelines Prohibiting the Use of Illegal Tax Protester and Similar Designations

Chief, Appeals  AP
Director, Office of Research, Analysis, and Statistics  RAS
Chief, Criminal Investigation  SE:CI
Chief Information Officer  OS:CIO
Director, Communications and Liaison, National Taxpayer Advocate  TA:CCL
Director, Office of Servicewide Policy, Directives, and Electronic Research  RAS:SPDER
Director, Collection, Small Business/Self-Employed Division  SE:S:C
Director, Communications, Government Liaison, and Disclosure, Small Business/Self-Employed Division  SE:S:CGL&D
Director, Compliance, Wage and Investment Division  SE:W:CP
Acting Director, Strategy and Finance, Wage and Investment Division  SE:W:S
Acting Chief, Performance Improvement, Wage and Investment Division  SE:W:S:PI
Chief Counsel  CC
National Taxpayer Advocate  TA
Director, Office of Legislative Affairs  CL:LA
Director, Office of Program Evaluation and Risk Analysis  RAS:O
Office of Management Controls  OS:CFO:AR:M
Audit Liaisons:
    GAO/TIGTA Liaison, Deputy Commissioner for Operations Support  OS
    GAO/TIGTA Liaison, Deputy Commissioner for Services and Enforcement  SE
    GAO/TIGTA Liaison, National Taxpayer Advocate  TA
    GAO/TIGTA Liaison, Appeals  AP:P:S
    Acting Chief, Customer Liaison, Small Business/Self-Employed Division  SE:S:COM
    Acting Senior Operations Advisor, Wage and Investment Division  SE:W:S
    GAO/TIGTA Liaison, Chief Information Officer  OS:CIO:SM:PO
    GAO/TIGTA Liaison, Criminal Investigation  SE:CI:S:PS

**Appendix IV**

## Outcome Measures

This appendix presents detailed information on the measurable impact that the review results will have on tax administration.  While no recommendations were made in this report, the Treasury Inspector General for Tax Administration has made prior recommendations that continue to provide benefits.  These benefits will be incorporated into our Semiannual Report to the Congress.

Type and Value of Outcome Measure:

- Taxpayer Rights and Entitlements – Actual; 309 taxpayers affected (see page 3).

Methodology Used to Measure the Reported Benefit:

We reviewed the following:

- From the Appeals Centralized Database System (ACDS) – a total of 93,961 open Appeals narrative comment records received between October 2003 and September 2004 and identified 1 case narrative that contained Illegal Tax Protester (ITP) or a similar designation.

- From the Automated Collection System (ACS) – approximately 2.4 million records open as of September 2004 from a database with history action dates between October 2003 and September 2004 and identified 49 taxpayer case narratives that contained ITP or a similar designation.

*EXHIBIT B*

Fiscal Year 2005 Statutory Audit of Compliance With Legal Guidelines Prohibiting the Use of Illegal Tax Protester and Similar Designations

- From the Criminal Investigation Management Information System (CIMIS) – a total of 19,020 cases opened between October 2003 and September 2004 and identified 3 taxpayer case narratives that contained ITP or a similar designation.

- From the Integrated Collection System (ICS) – approximately 1.1 million records open as of September 2004 from a database with history action dates between October 2003 and September 2004 and identified 214 taxpayer case narratives that contained ITP or a similar designation.

- From the Taxpayer Advocate Management Information System (TAMIS) – a total of 34,537 open cases with activity between October 2003 and September 2004 and identified 2 taxpayer case narratives that contained ITP or a similar designation.

- From the Taxpayer Information File (TIF) – approximately 17.2 million taxpayer accounts open on the IDRS as of January 2004 with TIF Activity Code dates input between October 2003 and September 2004 and identified 40 taxpayer history notations that contained ITP or a similar designation.

Type and Value of Outcome Measure:

- Reliability of Information – Actual; 19 unique Internal Revenue Manual (IRM) subsections (see page 2).

Methodology Used to Measure the Reported Benefit:

In December 2004, we searched various versions of the IRM available to Internal Revenue Service (IRS) employees for ITP references. These were found on the Servicewide Electronic Research Program (SERP), the IRS publishing web site, the IRS public Internet web site, and paper.

Appendix V

Use of Illegal Tax Protester and Similar Designations in Case Narratives by Internal Revenue Service Employees During Fiscal Years 2003, 2004, and 2005

| Exception Location | Fiscal Year 2003 Review | | | Fiscal Year 2004 Review | | | Fiscal Year 2005 Review | | |
|---|---|---|---|---|---|---|---|---|---|
| | Employees | Protester Use | Similar Designation Use | Employees | Protester Use | Similar Designation Use | Employees | Protester Use | Similar Designation Use |
| Appeals Centralized Database System (ACDS) | 2 | 0 | 2 | 0 | 0 | 0 | 1 | 0 | 1 |
| Automated Collection System (ACS) | 77 | 66 | 17 | 41 | 31 | 13 | 44 | 38 | 11 |
| Criminal Investigation Management Information System (CIMIS) | 0 | 0 | 0 | 5 | 2 | 3 | 3 | 0 | 3 |

Fiscal Year 2005 Statutory Audit of Compliance With Legal Guidelines Prohibiting the Use of Illegal Tax Protester and Similar Designations

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Integrated Collection System (ICS) | 209 | 93 | 135 | 153 | 76 | 101 | 187 | 95 | 119 |
| Taxpayer Advocate Management Information System (TAMIS) | 4 | 0 | 4 | 4 | 3 | 1 | 2 | 0 | 2 |
| Taxpayer Information File (TIF) | N/A | N/A | N/A | N/A | N/A | N/A | 35 | 36 | 4 |
| TOTALS | 292 | 159 | 158 | 203 | 112 | 118 | 272 | 169 | 140 |

Source: Various Internal Revenue Service case narratives and Treasury Inspector General for Tax Administration reports entitled Fiscal Year 2003 Statutory Audit of Compliance With Legal Guidelines Prohibiting the Use of Illegal Tax Protester and Similar Designations (Reference Number 2003-40-098, dated April 2003) and Fiscal Year 2004 Statutory Audit of Compliance With Legal Guidelines Prohibiting the Use of Illegal Tax Protester and Similar Designations (Reference Number 2004-40-109, dated June 2004).

Appendix VI

## Examples of Illegal Tax Protester and Similar Designations Found in Case Narratives

During our Fiscal Year 2005 review, we searched for the following words and abbreviations to identify Illegal Tax Protester (ITP) and other similar designations being used by Internal Revenue Service (IRS) employees in their case narratives. We did not take exception to employee comments quoting a taxpayer's self-designation as an ITP.

| CHALLENGE | CHLLNG | CNSTTTNL | CONGRESSIONAL |
|---|---|---|---|
| CONSTITUTIONAL | ITP | OBJECTOR | PROTESTER |
| PROTESTOR | PROTESTR | PROTSTR | PRTSTR |

The following comments made by employees are a few examples of ITP and similar designations found in IRS employees' case narratives.

- THIS TP [taxpayer] IS A TAX PROTESTER.
- HERE WE HAVE A LONG TIME COMPLIANCE CHALLENGED NON-TAXPAYER WHO HAS A 15 YEAR RECORD OF NOT PAYING [gender removed] TAXES.
- TP [taxpayer] IS A NON COMPLIANCE FILER AKA [also known as] IN THE OLD DAYS AS A TAX PROTESTOR.
- IT IS CLEAR THAT TP [taxpayer] IS A TAX PROTESTOR ALTHOUGH [gender removed] STATES IN [gender removed] LETTER THAT [gender removed] IS NOT.
- NOW I SEE THE PROTESTOR BEGINNING TO COME OUT.
- MR. & [and] MRS. [name removed] HAVE NOT BEEN COOPERATIVE TAXPAYERS AND ARE IDENTIFIED AS "CONSTITUTIONALLY CHALLENGED" [sic]
- TP IS "CONSTITUTIONALLY CHALLENGED" OR WHATEVER WE ARE CALLING THEM NOWADAYS.
- SINCE TP [taxpayer] IS A TAX PROTESTOR DO NOT WANT TO GIVE [gender removed] APPEAL RIGHTS TWICE.

**EXHIBIT B**

**Appendix VII**

Fiscal Year 2005 Statutory Audit of Compliance With Legal Guidelines Prohibiting the Use of Illegal Tax Protester and Similar Designations

- TAXPAYER SEEMS NOT TO BELIEVE IN TAXATION. TP [taxpayer] MAY BE A TAX COMPLIANCE CHALLENGED TAXPAYER.

- TP [taxpayer] VERY NASTY PROTESTER.

## Management's Response to the Draft Report

*The response was removed due to its size. To see the response, please go to the Adobe PDF version of the report on the TIGTA Public Web Page.*

*EXHIBIT B*

# Additional Efforts Are Needed to Ensure Taxpayer Rights Are Protected When Manual Levies Are Issued

## April 2004

## Reference Number:  2004-30-094

**This report has cleared the Treasury Inspector General for Tax Administration disclosure review process and information determined to be restricted from public release has been redacted from this document.**

April 29, 2004

MEMORANDUM FOR COMMISSIONER, SMALL BUSINESS/
SELF-EMPLOYED DIVISION

FROM:        *(for)*  Gordon C. Milbourn III /s/ Margaret E. Begg
                    Acting Deputy Inspector General for Audit

SUBJECT:    Final Audit Report - Additional Efforts Are Needed to Ensure Taxpayer Rights Are Protected When Manual Levies Are Issued  (Audit # 200330031)

This report presents the results of our review to determine whether the Internal Revenue Service (IRS) has complied with 26 United States Code (U.S.C.) Section (§) 6330, Notice and Opportunity for Hearing Before Levy.  The IRS Restructuring and Reform Act of 1998 (RRA 98) requires the IRS to notify taxpayers at least 30 days before initiating any levy action, to give taxpayers an opportunity to formally appeal the proposed levy. Specifically, we determined whether the IRS has sufficient controls in place to ensure taxpayers are advised of their right to a hearing at least 30 days prior to levy action. This is the sixth annual report the Treasury Inspector General for Tax Administration (TIGTA) has issued in compliance with the RRA 98 to determine whether the IRS is complying with legal guidelines over the issuance of levies.

Prior TIGTA reports have recognized that the IRS has implemented tighter con~~trols ov~~

**FILED**

*EXHIBIT C*

06 1364   AUG - 1 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

the issuance of systemically generated levies. This was due primarily to the development of systemic controls in both the Automated Collection System and Integrated Collection System (ICS) to prevent a levy from being generated unless there were at least 30 days between the date taxpayers received notice of their appeal rights and the date of the proposed levy. Our testing of these controls indicated that they continue to function effectively.

However, last year's report also discussed the fact that revenue officers sometimes issued manual levies to taxpayers who were not properly notified of their appeal rights. We recommended the IRS require managers to review and approve all manual levies prepared by revenue officers in order to ensure taxpayers are properly advised of their appeal rights. The IRS declined to implement this recommendation but did issue a memorandum on June 20, 2003, reminding revenue officers that proper notification must be given to a taxpayer before a manual levy is issued. Our review of manual levies issued between July 1 and October 31, 2003, indicated that this corrective action was not effective. Revenue officers are still not always properly notifying taxpayers of their appeal rights. Specifically, in 5 of 40 cases reviewed, we determined that revenue officers issued manual levies to seize the assets of taxpayers who had not been notified of their appeal rights. We recommended the Commissioner, Small Business/Self-Employed Division, reconsider requiring managers to review all manual levies prepared by a revenue officer.

Management's Response: While IRS management agreed that taxpayers' rights must be protected, they did not agree with our recommendation to have group managers approve all manual levies prepared by revenue officers. They expressed concern about the impact on field employees that further increasing the oversight of enforcement action could have. IRS management also indicated they believe the errors evidence a training issue.

To help address these concerns and reinforce the existing procedures, the IRS issued an ICS Alert on March 5, 2004. This Alert reminded employees to ensure taxpayer rights are protected whenever a manual levy is issued. Management's complete response to the draft report is included as Appendix V.

Office of Audit Comment: We recognize the IRS' caution in implementing any managerial action it believes may inhibit effective enforcement action by revenue officers. However, we also recognize the importance of the RRA 98 provision requiring that taxpayers be properly advised of their appeal rights prior to asset seizure through levy action. We hope the IRS' issuance of the ICS Alert reminding revenue officers that all notice requirements must be satisfied before a manual levy is issued will suffice to ensure taxpayer rights are adequately safeguarded. While we still believe our recommendation is worthwhile, we do not intend to elevate our disagreement concerning

*EXHIBIT C*

it to the Department of the Treasury for resolution. We will continue to closely monitor this issue during future mandatory reviews of the IRS' collection activities.

Copies of this report are also being sent to IRS managers affected by the report recommendation. Please contact me at (202) 622-6510 if you have questions or Parker Pearson, Acting Assistant Inspector General for Audit (Small Business and Corporate Programs), at (410) 962-9637.

# Table of Contents

Background

Controls Implemented to Protect Taxpayer Rights During the Issuance of Systemic Levies Are Operating Effectively

Revenue Officers Are Still Issuing Some Manual Levies Without Properly Notifying Taxpayers of Their Appeal Rights

    Recommendation 1:

Appendix I – Detailed Objective, Scope, and Methodology

Appendix II – Major Contributors to This Report

Appendix III – Report Distribution List

Appendix IV – Outcome Measures

Appendix V – Management's Response to the Draft Report

## Background

When taxpayers refuse to pay delinquent taxes, the Internal Revenue Service (IRS) has authority to work directly with financial institutions and other third parties to seize taxpayers' assets. This action is commonly referred to as a "levy." The IRS Restructuring and Reform Act of 1998 (RRA 98) requires the IRS to notify taxpayers at least 30 days before initiating a levy action, to give taxpayers an opportunity to formally appeal the proposed levy.

The RRA 98 also requires the Treasury Inspector General for Tax Administration (TIGTA) to annually verify whether the IRS is complying with the new provisions. This is the sixth year that the TIGTA has evaluated the controls over levies.

***EXHIBIT C***

Two operations within the IRS issue levies to collect delinquent taxes:

- • The Automated Collection System (ACS), where Customer Service Representatives (CSR) contact delinquent taxpayers by telephone to collect unpaid taxes and secure tax returns.

- • The Collection Field function (CFf), where revenue officers contact delinquent taxpayers in person as the final step in the collection process. Field contact becomes necessary when the ACS does not resolve the tax matter. Delinquent cases that are assigned to revenue officers in the IRS field offices are controlled and monitored with the Integrated Collection System (ICS).

Both operations issue two types of levies: systemically generated levies and manual levies. Previous TIGTA reports have recognized the IRS has significantly improved controls over the issuance of systemically generated levies. However, the TIGTA's June 2003 report did identify that additional controls are needed over manual levies issued by revenue officers.

This review was conducted at the Small Business/Self-Employed (SB/SE) Division Headquarters in New Carrollton, Maryland, and at Compliance Area 3 and 11 Offices, headquartered in Philadelphia, Pennsylvania, and Denver, Colorado, respectively. We conducted the audit from October 2003 through February 2004 in accordance with *Government Auditing Standards.*

Detailed information on our audit objective, scope, and methodology is presented in Appendix I. Major contributors to the report are listed in Appendix II.

## **Controls Implemented to Protect Taxpayer Rights During the Issuance of Systemic Levies Are Operating Effectively**

Systemic controls in both the ACS and ICS are effective to ensure taxpayers receive timely notification of their appeal rights.

### **ACS controls**

The first step in the collection process involves mailing taxpayers a series of notices asking for payment of delinquent taxes. If taxpayers do not comply, the majority of the accounts are forwarded to an ACS Call Center where CSRs contact taxpayers by telephone to resolve their accounts. If accounts cannot be resolved, CSRs have the authority to issue levies.

Virtually all levies issued by CSRs are generated through the ACS' automated system. This automated system contains a control, developed to comply with the RRA 98, that compares the date the taxpayer was notified of the pending levy with the date requested for the actual levy. If there are fewer than 30 days between the dates, the system will not generate a levy. This control is designed to ensure taxpayers have been notified at least 30 days prior to the levy and have been informed of their appeal rights for any systemically generated levy.

*EXHIBIT C*

We tested the effectiveness of this control by reviewing a random sample of 30 systemically generated levies issued by the ACS between July 1 and October 31, 2003. All 30 taxpayers were timely notified of their appeal rights. During fieldwork, we also tested the control by requesting a levy on a live case for which fewer than 30 days had elapsed since the final notice date. The system would not issue the levy. Based on these results, we concluded that the systemic controls over levies issued in the ACS Call Centers effectively protect taxpayers' appeal rights.

## ICS controls

Many times, notices and telephone calls to taxpayers do not successfully resolve delinquent accounts, and cases have to be assigned to revenue officers in CFf offices for face-to-face contact with taxpayers. Cases assigned to revenue officers are controlled on the ICS. Revenue officers use the ICS to record collection activity on delinquent cases and generate certain enforcement actions such as levies.

The IRS installed a control in the ICS similar to the control in the ACS that prevents a levy from being issued unless taxpayers have received 30 days notice and been informed of their appeal rights. If fewer than 30 days have elapsed since the final notice date, the system will not generate a levy.

We tested the effectiveness of this systemic control by reviewing a random sample of 30 ICS cases that had levies issued between July 1 and October 31, 2003. All 30 of the taxpayers had received notification of their appeal rights at least 30 days prior to the levy. Next, we tested the control by attempting to generate a levy on a live case for which fewer than 30 days had elapsed since the final notice date. The system would not issue the levy.

Finally, we tested another systemic control by attempting to alter a critical date in the ICS history section. We could not alter the date to generate the levy. Based on these results, we concluded that the systemic controls over levies issued by revenue officers in CFf offices effectively protect taxpayers' appeal rights.

While the IRS has done an effective job of implementing controls over systemic levies generated by the ACS and ICS, additional controls are needed over manual levies issued by revenue officers.

## Revenue Officers Are Still Issuing Some Manual Levies Without Properly Notifying Taxpayers of Their Appeal Rights

The second type of levy that both CSRs and revenue officers can issue is the manual levy. That is, the levy is issued outside of the ACS and ICS automated processes and is not subject to the systemic controls.

Because manual levies are issued outside of the ACS and ICS automated processes, an automated audit trail for these actions is not produced. Therefore, it is impossible to reliably determine the exact number of manual levies that were issued by either CSRs or revenue officers during our

*EXHIBIT C*

review period. IRS management did inform us that they believe manual levies are issued infrequently.

Although the ACS CSRs primarily issue levies systemically, they also issue manual levies under certain circumstances, such as levies on Individual Retirement Accounts and jeopardy situations. Manual levies require the same advance notification of the taxpayer as systemic levies except in cases involving jeopardy situations. IRS procedures require that manual levies issued by CSRs be reviewed and approved by a manager prior to the levy being issued. We consider this managerial review to be a strong control.

Revenue officers similarly issue levies systemically, in most cases, through the ICS. They are also authorized to issue a manual levy on any case as needed. While managerial approval is mandatory for manual levies issued by ACS employees, no review or approval is required when revenue officers issue a manual levy.

We believe there is a high risk associated with these manual levies because the IRS has not implemented any controls to ensure taxpayers' appeal rights are protected as required by the RRA 98. Our June 2003 report discussed the fact that revenue officers sometimes issued manual levies to taxpayers who were not properly notified of their appeal rights. We recommended the IRS require managers to review and approve all manual levies prepared by revenue officers in order to ensure taxpayers are properly advised of their appeal rights. The IRS declined to implement this recommendation because it believed it would impede prompt enforcement action. The IRS did issue a memorandum on June 20, 2003, reminding revenue officers that proper notification must be given to a taxpayer before a manual levy is issued.

We analyzed the ICS case inventory assigned to revenue officers to identify any manual levies issued between July 1 and October 31, 2003. Because there is no automated audit trail produced for manual levies, we analyzed case history comments for any references to a manual levy. Using this methodology, we identified 40 cases in which a manual levy was issued to seize taxpayers' assets. In 5 of the 40 cases, the revenue officer did not properly notify the taxpayers of their appeal rights before issuing the manual levies. None of the five manual levies involved jeopardy situations. Because of the imprecise nature of revenue officer case history entries, there could have been significantly more manual levies issued during our review period than the 40 we identified.

Not offering appeal rights to taxpayers prior to issuing levies is a potential Section 1203 violation of the RRA 98 and could result in the revenue officer being terminated for misconduct. We have referred the five cases to the TIGTA Office of Investigations for further evaluation.

## Recommendation

1.  The Commissioner, SB/SE Division, should reconsider developing and implementing controls over manual levies issued by revenue officers working in the IRS field offices to

*EXHIBIT C*

ensure taxpayers are properly offered their appeal rights. At a minimum, the Commissioner, SB/SE Division, should require that manual levies be reviewed and approved by a manager. This would help ensure the 30-day requirement has been met before levy action.

<u>Management's Response</u>: While IRS management agreed that taxpayers' rights must be protected, they did not agree with our recommendation to have group managers approve all manual levies prepared by revenue officers. They expressed concern about the impact on field employees that further increasing the oversight of enforcement action could have. IRS management also indicated they believe the errors evidence a training issue.

To help address these concerns and reinforce the existing procedures, the IRS issued an ICS Alert on March 5, 2004. The Alert reminded employees to ensure taxpayer rights are protected whenever a manual levy is issued. It also included a reminder that the final notice issued by the campuses does not contain the appropriate due process notification.

<u>Office of Audit Comment</u>: We recognize the IRS' caution in implementing any managerial action it believes may inhibit effective enforcement action by revenue officers. However, we also recognize the importance of the RRA 98 provision requiring that taxpayers be properly advised of their appeal rights prior to asset seizure through levy action. We hope the IRS' issuance of the ICS Alert reminding revenue officers that all notice requirements must be satisfied before a manual levy is issued will suffice to ensure taxpayer rights are adequately safeguarded. We will continue to closely monitor this issue during future mandatory reviews of the IRS' collection activities.

**Appendix I**

## Detailed Objective, Scope, and Methodology

The overall objective of this review was to determine whether the Internal Revenue Service (IRS) has complied with 26 United States Code (U.S.C.) Section (§) 6330, Notice and Opportunity for Hearing Before Levy. To accomplish our objective, we:

I.      Determined whether the IRS was maintaining sufficient automated controls and procedures to ensure taxpayers had been advised of their right to a hearing at least 30 days prior to any levy action.

A.   Performed a walk-through of two Automated Collection System (ACS) Call Centers and four Collection Field function offices and evaluated procedures and controls over due process notices.

B.   Tested whether systemic controls in the ACS and the Integrated Collection System (ICS) were preventing levies from being issued in fewer than 30 days from the final

*EXHIBIT C*

, notice date.

C.  Tested whether IRS employees could modify the final notice date in the ACS and ICS.

D.  Selected a random sample of 30 ICS levies from the population of 110,670 levies issued between July 1 and October 31, 2003, from the ICS database of open cases. We analyzed Master File transcripts and the ICS record history for the sample cases selected and verified whether taxpayers had been advised of their right to a hearing at least 30 days prior to any levy action. We did not use statistical sampling because, based on prior years' testing, we did not anticipate finding any errors; consequently, we would not need to project our results.

E.S  elected a random sample of 30 ACS levies from the population of 510,288 levies issued between July 1 and October 31, 2003, from the ACS database of open cases. We analyzed Master File transcripts and the ACS record history for the sample cases selected and verified whether taxpayers had been advised of their right to a hearing at least 30 days prior to any levy action. We did not use statistical sampling because, based on prior years' testing, we did not anticipate finding any errors; consequently, we would not need to project our results.

II.    Determined whether manual levies issued by revenue officers complied with legal guidelines in 26 U.S.C. § 6330.

A.  Identified any references to manual levies issued between July 1 and October 31, 2003, by querying the narrative history text field of the ICS open case inventory. We identified a population of 40 manual levies that were issued during our review period and included all of them in our review.

1.  Requested complete case history files (history query) for all cases containing references to manual levies identified in step II.A.

2.  Reviewed case history documentation and identified whether a revenue officer had issued a manual levy.

3.  Analyzed Master File transcripts and ICS history files to determine whether taxpayers were provided at least 30 days notice prior to any levy action initiated by the IRS.

**Appendix II**

## **Major Contributors to This Report**

Parker F. Pearson, Acting Assistant Inspector General for Audit (Small Business and Corporate
**EXHIBIT C**

Programs)
Richard Dagliolo, Director
Anthony J. Choma, Audit Manager
Cynthia Dozier, Senior Auditor
Mildred Rita Woody, Senior Auditor
Seth Siegel, Auditor

**Appendix III**

## Report Distribution List

Commissioner  C
Office of the Commissioner – Attn:  Chief of Staff  C
Deputy Commissioner for Services and Enforcement  SE
Commissioner, Wage and Investment Division  SE:W
Acting Deputy Commissioner, Small Business/Self-Employed Division  SE:S
Deputy Commissioner, Wage and Investment Division  SE:W
Acting Director, Compliance, Small Business/Self-Employed Division  SE:S:C
Director, Compliance, Wage and Investment Division  SE:W:CP
Director, Strategy and Finance, Wage and Investment Division  SE:W:S
Chief Counsel  CC
National Taxpayer Advocate  TA
Director, Office of Legislative Affairs  CL:LA
Director, Office of Program Evaluation and Risk Analysis  RAS:O
Office of Management Controls  OS:CFO:AR:M
Audit Liaisons:
        Commissioner, Small Business/Self-Employed Division  SE:S
Commissioner, Wage and Investment Division  SE:W

**Appendix IV**

## Outcome Measures

This appendix presents detailed information on the measurable impact that our recommended corrective action will have on tax administration.  This benefit will be incorporated into our Semiannual Report to the Congress.

Type and Value of Outcome Measure:

- Taxpayer Rights and Entitlements – Actual; five taxpayers did not receive notice of

*EXHIBIT C*

their appeal rights before the Internal Revenue Service (IRS) took levy action (see page 4).

Methodology Used to Measure the Reported Benefit:

We analyzed (using computerized queries) the Integrated Collection System case inventory of delinquent taxpayers assigned to revenue officers and identified 40 manual levies issued between July 1 and October 31, 2003. Since the IRS does not monitor or record the use of manual levies, we were unable to determine the total number of manual levies actually issued by revenue officers working in field offices. Because the population of manual levies is unknown, the findings of our case review cannot be projected.

**Appendix V**

## **Management's Response to the Draft Report**

*The response was removed due to its size. To see the response, please go to the Adobe PDF version of the report on the TIGTA Public Web Page.*

**EXHIBIT C**

# JOINT HEARING BEFORE THE COMMITTEES OF THE

# UNITED STATES SENATE

# AND

# UNITED STATES HOUSE OF REPRESENTATIVES

# MAY 20, 2003



## "The Strategic Plans and Budget of the IRS"

## STATEMENT FOR THE RECORD

06 1364

## Pamela J. Gardiner

*EXHIBIT D*

FILED

AUG - 1 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

# Acting Inspector General
# Treasury Inspector General for Tax Administration

Mr. Chairman and Members of the Committees, I appreciate the opportunity to appear before you today to discuss the challenges and vulnerabilities the Internal Revenue Service (IRS) continues to face in improving the economy, efficiency, and effectiveness of tax administration.  My comments will also address the IRS' compliance with the IRS Restructuring and Reform Act of 1998 (RRA 98).

Three years ago when the former Treasury Inspector General for Tax Administration (TIGTA) appeared before you and reported on the IRS' progress in implementing the RRA 98 provisions, the IRS was in the midst of a significant business restructuring.  The IRS was reorganizing itself into four operating divisions to have end-to-end responsibility for defined groups of taxpayers with similar characteristics.  Key business systems modernization initiatives were underway to redesign the IRS' outdated computer systems, and management was improving the organization's customer service operations to better serve and communicate with taxpayers.  As of today, while the IRS has revamped some of its business processes and practices, progress has been slow in implementing critical improvements to IRS operations to provide world-class service to taxpayers.

With the appointment of a new IRS Commissioner and the expected departures of key executives, the IRS is also encountering tremendous leadership changes.    The new Commissioner is challenged with continuing the IRS' reinvention efforts in modernizing its computer systems, protecting taxpayer rights and privacy, and ensuring tax law compliance and enforcement while providing improved customer service.  In addition to turnover in the top IRS management positions, there are also membership changes on the IRS Oversight Board that could impact the direction of ongoing IRS initiatives.

In this environment, TIGTA continues to devote its efforts to provide useful, balanced information to IRS management and other decision-makers.  TIGTA audit coverage focuses on the management and performance challenges facing the IRS.  We are providing critical information on the IRS' operational and programmatic issues such as business systems modernization (BSM), tax compliance, computer and physical security, performance and financial management, customer service, returns processing, and the filing season.  In order to safeguard the IRS' ability to collect revenue and combat fraud, waste, and abuse, TIGTA's investigative work is centered on:

➢__IRS employee integrity.

➢__IRS employee and infrastructure security.

➢__External attempts to corrupt federal tax administration.

As a result of our audit and investigative work, I believe the following issues are the most

**EXHIBIT D**

significant challenges facing the IRS.

## Information Systems Security

After September 11, 2001, the IRS and TIGTA's Office of Investigations took significant actions to protect IRS employees, facilities, and computer data infrastructure from the threat of terrorism. The process that TIGTA established to share information with the IRS about potential terrorist threats was very positively evaluated in an October 2002 General Accounting Office (GAO) audit report entitled, *IRS and Terrorist Related Information Sharing* (GAO-03-50R).

The IRS has developed adequate security policies and procedures but has not implemented them effectively. As a result, sensitive information remains vulnerable to attack by hackers, terrorists, and disgruntled employees and contractors. While recognizing that total security can never be achieved and that there are necessary trade-offs between security and operational needs, TIGTA continues to identify significant weaknesses in infrastructure and applications security.

TIGTA attributes many of the IRS' security problems to misplaced accountability. As we reported last year, the IRS does not hold its business unit (functional) managers accountable for the security of their systems. Instead, the Office of Security Services took primary responsibility for this function. As a result, functional managers did not annually assess the security of their systems, as required by both the Office of Management and Budget Circular A-130, *Management of Federal Information Resources,* and the *Federal Information Security Management Act.* Significant effort will be required to transfer primary responsibility for systems security from the Office of Security to business unit managers. In addition, attention is needed to enhance the security awareness of IRS managers and employees, and employees with key security responsibilities must be better trained.

## Business Systems Modernization

The IRS' goal of providing efficient and responsive information services to its operating divisions is heavily dependent on modernizing its core computer systems while maintaining the existing systems. Since 2001, the BSM Program has been deploying projects and learning valuable lessons that should help improve future projects. Deployed projects have included an upgraded IRS    toll-free telephone system to provide capacity to route taxpayers' calls to the appropriate IRS employee; an Internet application that allows taxpayers to check the status of their returns and refunds; and portions of an IRS-wide secure technology environment and a system designed to improve the availability and performance of modernized systems. The IRS also released an update to its Enterprise Architecture that serves as the roadmap for current and future modernization projects. However, the most significant and complex projects have yet to be delivered.

One of these projects, the Customer Account Data Engine or CADE, will eventually replace the existing Master File of taxpayer accounts. The Master File is the IRS' database that stores various types of taxpayer account information and includes individual, business, and employee plans and exempt organizations data. Therefore, CADE will be the foundation for managing taxpayer

*EXHIBIT D*

accounts in the IRS' modernization plan. CADE will consist of databases and related applications that will include processes for daily posting, settlement, refund processing, and issue detection for taxpayer account and return data.

The CADE databases and related applications will also enable the implementation of other modernized systems that will improve customer service and compliance and allow the on-line posting and updating of taxpayer account and return data. The portion of the CADE related to individual tax accounts will be incrementally deployed in five releases, each related to a specific taxpayer segment, over several years.

| | RELEASE ONE | RELEASE TWO | RELEASE THREE | RELEASE FOUR | RELEASE FIVE |
|---|---|---|---|---|---|
| Tax Return Types | 1040EZ | 1040EZ 1040A 1040 (without Sch. C,E,F) | 1040EZ 1040A 1040 (without Sch. C,E,F) | 1040 with Sch. C,E, F, [1] 94X [2] 720 | All remaining individual tax returns |
| Filing Status | Single | All (Single, Married, Head of Household) | All | All | All |
| Account Characteristics | Refund or even balance No open account issues | Refund or even balance No open account issues | Full paid, refund or balance due No open account issues | Full paid, refund or balance due No open account issues | All accounts not included in previous releases |
| [3] Est. Returns | 6 Million | 29 Million | 41 Million | 34 Million | 12 Million |
| Est. Delivery | | | | | |
| As of April 2000 | January 2002 | August 2002 | July 2003 | July 2004 | July 2005 |
| As of March 2001 | January 2002 | January 2003 | January 2004 | January 2005 | January 2006 |
| As of April 2003 | August 2003 | January 2005 | TBD | TBD | TBD |

The IRS and its contractor (PRIME) have made progress in delivering the CADE project by building a substantial portion of Release I and creating a comprehensive foundation for all five releases. However, the contractor's development of the CADE project has experienced significant delays and increased costs. As shown in the previous table, the Release 1 deployment date is now estimated to be August 2003, which is about 20 months behind its planned delivery date.

The IRS and PRIME contractor initially estimated that Release 1 could be delivered for approximately $51.9 million, an estimate that was revised 6 months later to $64.6 million. The IRS and PRIME contractor have agreed to cap the Release 1 development costs at $54.5 million. Project delays can be attributed to underestimating the complexity of this effort and difficulties in identifying and managing the project requirements. Specifically, these difficulties occurred in developing the balancing, control, and reconciliation process; comprehensive documentation for the CADE Computer Operations Handbook; computer system naming standards; and testing

*EXHIBIT D*

activities.

As a result of delays in deploying the CADE, approximately 35 million taxpayers did not receive the benefits of faster tax return processing, and thus faster refunds, during the 2002 and 2003 Filing Seasons. In addition, the modernization projects that will provide improved customer service and compliance activities will be delayed because they are dependent upon CADE. Based on current schedules, these customer service and compliance improvement projects will not be deployed until at least Fiscal Year (FY) 2006 or later. Delays in these projects will have the following adverse effects on the IRS and taxpayers:

➥__The time it takes the IRS to initiate a compliance contact with a taxpayer will not be reduced.

➥__The IRS' ability to offer one-stop service to taxpayers by allowing Customer Service Representatives to identify all issues a taxpayer might have with the IRS when a contact is initiated will be delayed.

➥__The IRS' ability to answer taxpayer account-related questions with timely and complete data will be limited.

## Customer Service

RRA 98 mandated that IRS be more responsive to customer needs. To refocus its emphasis on helping taxpayers understand and meet their tax responsibilities, the IRS revised its mission statement. The IRS has made some progress in enhancing its customer service activities. For example, taxpayers have several options from which to choose when they need assistance from the IRS in answering tax law questions. These options include walk-in service at nationwide Taxpayer Assistance Centers (TAC) and toll-free telephone assistance.

During this calendar year, TIGTA assessed the service provided by representatives at the TACs and through the Toll-Free Telephone System. Overall, the IRS has made improvements in providing service to the taxpaying public. For example, during January through April 2003, IRS employees correctly answered 25 percent more questions, provided 19 percent fewer incorrect answers, and referred 87 percent fewer taxpayers to publications than for this same period last year.

During our review of the TACs, TIGTA personnel visited 72 centers and posed 283 questions to IRS representatives. Results of our review are synopsized in the following chart:

| | *Number of Responses* | *Percentage* |
|---|---|---|

*EXHIBIT D*

| | | |
|---|---|---|
| Correct Answers | 199 | 70 |
| Incorrect Answers | 73 | 26 |
| No Answer Provided – Referred to Publication In Lieu of a Response | 8 | 3 |
| Other | 3 | 1 |

In January 2003, TIGTA also began assessing whether IRS employees were adhering to operating guidelines by referring the tax law questions we asked, which were outside the scope of services they have been trained to answer. The auditors asked 157 "out of scope" questions and determined that employees did not follow referral procedures for 105 (67 percent) of these questions.

The IRS' accuracy in responding to taxpayers' questions using the IRS' Toll-Free Telephone System was somewhat better than that at the TACs. Between January 27 and March 13, 2003, our reviewers performed on-line monitoring of 259 taxpayers calls and determined that IRS representatives correctly answered the taxpayers' questions in 71 percent of the cases.

Filing Season

The tax return filing season impacts every American taxpayer and is, therefore, always a highly critical program for the IRS. In addition to providing customer service to American taxpayers, the IRS must coordinate tax law changes, programs, activities, and resources to effectively plan and manage each filing season.

Overall, the 2003 Filing Season has gone well and tax returns are being processed timely. Based on TIGTA's review, it appears that the IRS should complete processing of individual returns on schedule with all tax refunds being timely issued within the required 45 days from the filing season closing date of April 15. IRS data show that, as of May 9, 2003, over 52 million electronic returns had been received. The official projection for total electronic returns is 54.3 million. Electronic returns have increased by 12 percent from this time last year. In addition, over 69 million paper returns had been received. The official projection for total paper returns is 78 million. Paper returns have decreased by 8 percent from this time last year.

Many new and significant tax law provisions affected taxpayers' Tax Year (TY) 2002 individual income tax returns, including two *Economic Growth and Tax Relief Reconciliation Act of 2001* provisions involving education expenses and retirement savings. These provisions included changes to education savings accounts, qualified tuition programs, and individual retirement arrangements (IRA). In addition, the Act created a new tuition and fees deduction and a new retirement savings contribution credit (also referred to as "saver's credit"). These changes were considered significant because they could affect an estimated 86.5 million taxpayers by providing tax benefits of up to $7.6 billion in FY 2003. Properly implementing such changes required the IRS to reprogram its computer systems to ensure that taxpayers received the tax benefits allowed

**EXHIBIT D**

by the new provisions.

TIGTA's analysis of IRS computer programming requests to prepare for the filing season showed that the requests were timely submitted and were generally accurate; however, some errors and omissions were identified. For example, computer programming requests to implement the new retirement savings contribution credit and request changes to the IRA deduction contained errors that could have denied credits or deductions to some taxpayers. Also, omissions in computer programming requests may have resulted in the loss of tax revenue by allowing certain taxpayers to receive larger credits or deductions than they were eligible to receive. This possibility exists for the new retirement savings contribution credit, the IRA deduction, and the student loan interest deduction.

## The IRS Restructuring and Reform Act of 1998

Due to the comprehensive nature of this reform law, the IRS has dedicated significant attention and resources toward implementing the RRA 98 provisions. RRA 98 included fundamental changes to tax law procedures and 71 provisions that increase or further protect taxpayers' rights. The IRS has taken several actions to improve compliance with these provisions. For example, in some instances, the IRS added a higher level of managerial review, implemented new computer controls to prevent certain violations from occurring, and provided additional training and guidance to help employees and managers understand the provisions' requirements. TIGTA has reported that the IRS has fully implemented three taxpayer rights provisions - *Mitigation of Failure to Deposit Penalty, Seizure of Property, and Taxpayer Advocate-Hardships*. The IRS is generally compliant with two other provisions – *Illegal Tax Protestor Designation and Collection Due Process for Liens and Levies*.

RRA 98 required TIGTA to review 10 of the 71 taxpayer rights provisions, as well as 2 other taxpayer rights provisions in prior legislation. TIGTA is currently in the fifth review cycle assessing the mandatory RRA 98 provisions. TIGTA's most recent audit results on these taxpayer rights provisions are as follows:

 ➢ *Notice of Levy* – Most levies are computer generated and subjected to systemic controls that effectively ensure that taxpayers are informed of their appeal rights at least 30 days prior to receiving a systemically generated levy. In some circumstances, however, IRS employees must issue manual levies. Though managers approve and review manual levies issued by Automated Collection System employees, manual levies issued by revenue officers are not required to be reviewed and approved by managers. This significantly increases the risk of taxpayers not having their appeal rights properly protected.

 ➢ *Restrictions on the use of enforcement statistics to evaluate employees* – A review of 74 judgmentally sampled enforcement employees' performance and related supervisory documentation prepared between October 1, 2001, and August 31, 2002, revealed no instances of the use of tax enforcement results, production quotas, or goals to evaluate employee performance. There was also improvement over the previous year in documenting

**EXHIBIT D**

the evaluation of employees on the fair and equitable treatment of taxpayers. In addition, a review of 21 statistically sampled supervisors showed the IRS completed the required consolidated office certification memoranda on whether tax enforcement results were used in a prohibited manner.

➢ *Notice of Lien* – An estimated 14,695 lien notifications, out of a   population of 367,385 lien notices prepared between August 1, 2001, and June 30, 2002, were not mailed to the taxpayer, the taxpayer's spouse, or to the taxpayer's business partners; or were not mailed to the taxpayer's or spouse's last known address. Taxpayer rights could be affected because the taxpayer who failed to receive a notice or who received a late notice might not be aware of the right to appeal or could have less than the 30-day period allowed by the law to request a hearing.

➢ *Seizures* – TIGTA determined that in a statistical sample of 102 seizures from the 218 seizures conducted by the IRS between October 2001 and June 2002, the IRS complied with legal provisions and internal procedures when seizing taxpayers' property for payment of delinquent taxes.

➢ *Illegal Tax Protestor (ITP) Designations* – The IRS has not reintroduced past ITP codes on the Master File, and formerly coded ITP taxpayer accounts have not been reassigned to a similar ITP designation. In addition, the IRS does not have any current publications with ITP references. However, IRS employees continue to make references to taxpayers as ITPs and other similar designations in case narratives. TIGTA identified 321 taxpayers that were potentially affected due to improper designations. We have not reported that these taxpayers have been harmed by the designations. Only a thorough review of each taxpayer's case and the treatment accorded that taxpayer would determine if these taxpayers have been harmed. In our most recent report on this subject, TIGTA recommended that the IRS review each case where the reference to ITP or similar designation had been identified and make such determinations.

In its response to the draft report, the IRS disagreed with our determination that in order to comply with this provision, IRS employees should not designate taxpayers as ITPs or similar designations in case histories.

➢ *Assessment Statute of Limitations* – Employees properly advised taxpayers of their rights to refuse or restrict the scope of the statute extension in 32 of 48 (67 percent) of the tax returns sampled. In 16 of 48 (33 percent) of the tax returns sampled, TIGTA could not determine if employees advised taxpayers of their rights because related case files   did not contain a record that taxpayers had been advised of their rights.   In 22 of the 24 (92 percent) jointly filed returns sampled, there was no documentation in the related case files that each taxpayer listed on the return was separately informed of his or her rights (i.e., dual notification).

➢ *Denials of Requests for Information Under the Freedom of Information  Act* – TIGTA identified an estimated 458 responses to Freedom of Information Act or Privacy Act requests

**EXHIBIT D**

where information was improperly withheld, out of 4,610 requests for information that were denied in whole or part, or where the IRS replied that responsive records were not available. There were also an estimated 1,052 responses to Internal Revenue Code Section 6103 requests where information was improperly withheld, out of an estimated population of 8,612 requests that were denied or partially denied or where requesters were told that records could not be located.

> *Collection Due Process* – The IRS substantially complied with the requirements of the law and ensured taxpayers' appeal rights were protected in 85 of 87 (98 percent) appeal cases reviewed. In the remaining 2 cases, TIGTA did not conclude that the noncompliance resulted in a legal violation of the taxpayer's Collection Due Process (CDP) rights since collection actions were not initiated. In addition, approximately 94 percent of the CDP determination letters provided to taxpayers (82 of 87 letters) followed the established IRS guidelines. This was a noticeable improvement over prior audit results when approximately 14 percent of the determination letters were determined deficient.

Neither TIGTA nor the IRS could evaluate the IRS' compliance with the following four provisions since IRS management information systems are not available to track the specific cases:

> Restrictions on directly contacting taxpayers instead of authorized representatives.

> Taxpayer complaints.

> Separated or divorced joint filer requests.

> Fair Debt Collection Practices Act (FDCPA) Violations – The IRS does track potential FDCPA violations on its computer systems; however, we determined that data on one system may not always be complete and accurate. Based on information recorded as potential FDCPA violations on the IRS' computer system, TIGTA identified two violations that occurred after July 22, 1998, that resulted in administrative actions being taken against employees. The IRS had no closed cases in which the IRS paid any money to taxpayers for civil actions resulting from FDCPA violations.

## Tax Compliance Efforts

The IRS' goal of providing world-class service to taxpayers hinges on the theory that, if the IRS provides the right mix of education, support, and up-front problem solving to taxpayers, the overall rate of voluntary compliance with the tax laws will increase. The compliance program (examining tax returns and collecting tax liabilities) would then address those taxpayers who purposefully did not comply. The challenge to IRS management is to establish a tax compliance program that identifies those citizens who do not meet their tax obligations, either by not paying the correct amount of tax or not filing proper tax returns.

Enforcement actions against individuals and businesses that purposefully conceal tax liabilities or even refuse to submit tax returns have fallen dramatically, despite concerns that tax cheating

*EXHIBIT D*

remains at high levels. The following chart exhibits the fact that, since FY 1996, the level of IRS enforcement activities has significantly declined.

| Enforcement Action | Overall Decline FY 1996 – FY 2002 |
|---|---|
| Face-to-Face Audits | 70% |
| Correspondence Audits | 56% |
| Liens | 34% |
| Levies | 79% |
| Seizures | 97% |

The overall decline in enforcement actions has been primarily attributed to a long-term reduction in enforcement staffing, to redirection of resources to customer service functions during the filing season, a decline in direct
examination time, and to IRS employees' concerns over the mandatory termination provision in Section 1203 of RRA 98.

IRS management and many stakeholders have been concerned about the decline in enforcement activities. However, the IRS has not conducted Taxpayer Compliance Measurement Program audits since 1988. Therefore, it currently has no reliable method to measure voluntary compliance or the effect that increased customer service and diversion of compliance resources are having on voluntary compliance. TIGTA believes that the ongoing National Research Program is a much-needed first step for providing the information necessary to gauge compliance levels and direct IRS compliance resources towards areas where attention is most needed.

While the decline in enforcement actions since FY 1996 has been dramatic, there are recent indications that the decline in some categories of enforcement actions and results has stabilized and, in some cases, shown improvement. For example, the IRS' FY 2002 compliance efforts and results were mixed, but showed some continuing positive changes that started in FY 2001. Specifically, the level of compliance activities and the results obtained in many, but not all, Collection areas in FY 2002 showed a continuing increase. The number of examinations of tax returns increased in FY 2002, but the overall percentage of tax returns examined stayed about the same due to increases in the number of tax returns filed. The IRS is taking a number of steps to enhance its compliance programs, including:

➢ Conducting the National Research Program, which is designed to measure the level of
**EXHIBIT D**

compliance nationwide.
- ➢ Restructuring many Collection and Examination processes.
- ➢ Focusing on known compliance problems through programs like the Offshore Voluntary Compliance Initiative and the use of Private Collection Agencies.

Section 1203 Violations

In addition to our audit responsibilities, RRA 98 charges TIGTA with investigating Section 1203 violations. Section 1203 identifies standards of conduct for IRS employees that are intended to address serious and willful acts of misconduct. Section 1203 requires the Commissioner of Internal Revenue to terminate the employment of any IRS employee found guilty of any 1 of 10 specific acts or omissions. TIGTA's role in investigating these allegations of employee misconduct serves to protect taxpayer rights and assure integrity in IRS operations.

The IRS monitors Section 1203 complaints in its Automated Labor and Employee Relations Tracking System - known by its acronym, "ALERTS." The vast majority of Section 1203 complaints recorded in ALERTS have alleged that an IRS employee violated a provision of the Internal Revenue Manual or the Internal Revenue Code in order to retaliate against or harass another person. The second category, as measured by the number of complaints, involves the employee's understatement of Federal tax liabilities.

The IRS receives and adjudicates numerous Section 1203 allegations where no independent TIGTA investigation is needed. When TIGTA involvement is warranted, our focus is to determine the facts of the situation as well as the intent of the violating employee. An employee's intent is an essential element that must be present for Section 1203 disciplinary action to be taken. As of March 31, 2003, ALERTS indicated that 96 employees have been fired and 202 employees have resigned or retired as a result of TIGTA and IRS investigations. Since the inception of Section 1203, TIGTA and the IRS have received a combined total of 5,605 Section 1203 complaints.

TIGTA and the IRS are working together to continuously improve the process of receiving, investigating, and adjudicating alleged violations of Section 1203. In March 2002, a streamlined process was implemented which, enabled TIGTA to make an early differentiation between those 1203 allegations that are valid and those that are not. As a result, TIGTA has been able to devote its resources to the investigation of bona fide 1203 allegations and other employee misconduct.

Mr. Chairman and Members of the Committees, I appreciate the opportunity to share with you today the more significant challenges that confront the new Commissioner and IRS senior management. Although the IRS has accomplished a great deal since the passage of RRA 98, much more remains to be done. TIGTA will continue its efforts to provide reliable and objective assessments of the IRS' progress in balancing compliance and customer service, and to investigate employee misconduct or external threats that jeopardize the integrity, efficiency, and effectiveness of the nation's tax administration system.

---

**EXHIBIT D**

[1] The Form 94X family of returns is used by employers to report income and unemployment taxes withheld from employee wages.

[2] Form 720 is the Quarterly Federal Excise Tax Return.

[3] Estimated tax returns (electronic and paper) based on 1999 statistics.

**EXHIBIT D**

# Improvements Should Be Made to Better Control and Report Internal Revenue Service Restructuring and Reform Act of 1998 Section 1203 Information

## September 2001

## Reference Number: 2001-10-188

**This report has cleared the Treasury Inspector General for Tax Administration disclosure review process and information determined to be restricted from public release has been redacted from this document.**

September 26, 2001

MEMORANDUM FOR DIRECTOR, COMMISSIONER'S

COMPLAINT PROCESSING AND ANALYSIS GROUP

DEPUTY INSPECTOR GENERAL FOR INVESTIGATIONS,

TREASURY INSPECTOR GENERAL FOR TAX

ADMINISTRATION

FROM: Pamela J. Gardiner /s/ Pamela J. Gardiner

Deputy Inspector General for Audit

SUBJECT: Final Audit Report - Improvements Should Be Made to Better Control and Report Internal Revenue Service Restructuring and Reform Act of 1998 Section 1203 Information

This report presents the results of our review and recommendations regarding Section (§) 1203 complaints. The objectives of this review were to determine if Internal Revenue Service (IRS) Restructuring and Reform Act of 1998 (RRA 98) § 1203 complaints were properly controlled by the IRS and the Treasury Inspector General for Tax Administration (TIGTA) and if RRA 98 § 1203 complaint information was accurately reported in the TIGTA Semiannual Report to the Congress.

*EXHIBIT E*

FILED

AUG - 1 2006

06 1364

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

In summary, at the time of our review, management could not locate 9 of 173 sampled RRA 98 § 1203 complaints, and management information systems did not contain current information for 22 of the 173 sampled § 1203 complaints. After we brought these issues to the attention of IRS and TIGTA Office of Investigations management, they began taking corrective actions to locate the 9 complaints and update the computer systems for the 22 complaints. We also identified 28 allegations outside of our sample where the § 1203 violation code had been removed from the management information system based on the procedures in effect prior to June 2000. This resulted in information being inconsistently reported in the TIGTA Semiannual Report to the Congress. Additionally, we identified two required § 1203 items that were reported incorrectly in a Fiscal Year (FY) 2000 TIGTA Semiannual Report to the Congress and five items not required to be reported that were overstated in two FY 2000 semiannual reports.

We recommended that IRS and TIGTA Office of Investigations management locate and complete necessary actions for the remaining RRA 98 § 1203 complaints that could not be located, correct the status for the remaining § 1203 complaints where the information was not current, develop a process to better control § 1203 complaints, and ensure that § 1203 complaint information is accurately reported in the TIGTA Semiannual Report to the Congress.

IRS and TIGTA Office of Investigations management agreed with these recommendations. Their comments have been incorporated into the report where appropriate, and the full text of their comments is included as Appendices VI and VII, respectively.

Copies of this report are also being sent to the IRS managers who are affected by the report recommendations. Please contact me at (202) 622-6510 if you have questions or John R. Wright, Acting Assistant Inspector General for Audit (Headquarters Operations and Exempt Organizations Programs), at (202) 622-8500.

# Table of Contents

Executive Summary

Objectives and Scope

Background

Results

      Section 1203 Complaints Could Not Always Be Located and Management Information Was Not Always Current or Consistent

**EXHIBIT E**